# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY VINCENT ZINGELEWICZ, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-286 |
| | ) | |
| v. | ) | Judge Donetta W. Ambrose |
| | ) | Magistrate Judge Susan Baxter |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Defendant's Motion for Summary Judgment (ECF No. 11) be denied, and that the Plaintiff's Motion for Summary Judgment (ECF No. 8) be denied to the extent he requests an award of benefits, but granted to the extent he seeks a vacatur of the decision of the Commissioner of Social Security ("Commissioner"), and a remand for further proceedings.

### II. REPORT

**A. BACKGROUND**

1. Procedural History

Jeffrey Vincent Zingelewicz ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for Disability Insurance Benefits

---

[1] Ms. Colvin became the Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as the named defendant in this suit in place of Michael J. Astrue, who previously served as Commissioner. *See* Fed.R.Civ.P. 25(d).

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq*. and § 1381 *et seq*. ("Act"). Plaintiff filed for benefits, claiming a complete inability to work as of July 1, 2008, due to severe clinical depression, anxiety, post-traumatic stress disorder, and drug abuse. (R. at 128, 131).[2] His applications were denied (R. at 54-61), and having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 8, 11).

2. General Background

Plaintiff was twenty six years old on the date of the ALJ's decision and has a high school education. (R. at 27). Plaintiff's job history included employment as a general laborer. (R. at 133). At the administrative hearing, Plaintiff amended his disability onset date to May 28, 2010. (R. at 36).

3. Treatment History

Plaintiff began receiving outpatient mental health treatment at Stairways Behavioral Health on May 28, 2010, his amended disability onset date. (R. at 233-237). At his initial evaluation, Plaintiff was seen by Jill Seus, LPC, and reported that he was seeking treatment for severe depression, post-traumatic stress disorder, anxiety, and possibly bipolar disorder. (R. at 233). Plaintiff reported that he was a victim of abuse in the past, had attempted suicide on two occasions, previously had hallucinations, and was last hospitalized in 2008. (R. at 233-234). He further reported that he had a history of drug abuse, but had stopped using drugs in 2008. (R. at 235). Plaintiff indicated he was on probation until March 2012. (R. at 235). Plaintiff stated that he had full custody of his children, was enrolled in school studying to be an electrician, and wanted a more stable lifestyle for himself and his children. (R. at 233-234, 236). He was diagnosed with bipolar disorder, unspecified, and posttraumatic stress disorder. (R. at 236). Ms.

---
[2] Citations to the administrative record (ECF No. 7), will be designated by the citation "(R. at __.)"

2

Seus assigned him a Global Assessment of Functioning ("GAF") score of 48,[3] and found that his prognosis was "fair." (R. at 236).

Plaintiff returned to Stairways on June 29, 2010 and was seen by Kari Dingfelder, MS. (R. at 232). Plaintiff reported that he was experiencing depression, and he was to begin individual therapy. (R. at 232).

On July 19, 2010, Plaintiff presented to Stairways for a court-ordered psychiatric evaluation performed by Belinda Stillman, D.O. (R. at 229-230). Plaintiff reported that he spent the weekend alone, had a "lot of problems" with depression, and had "horrible dreams." (R. at 229). Plaintiff reported that he lived with his mother and had full custody of his two sons. (R. at 229). He further reported that he helped his mother care for his grandmother, who suffered from Alzheimer's disease. (R. at 229). Plaintiff indicated that he was enrolled in school pursuing an electrician degree, but was on a medical leave of absence. (R. at 229). Plaintiff claimed that the school may not accept him back due to the concern he may have another decompensation episode. (R. at 229). Plaintiff reported a past history of substance abuse and participation in rehabilitation programs. (R. at 230). Dr. Stillman noted that a recent substance abuse evaluation of the Plaintiff was negative and that he did not meet the criteria for drug and alcohol services. (R. at 230).

On mental status examination, Plaintiff denied having any suicidal/homicidal ideations, thoughts of self-mutilation, or symptoms of paranoia or psychosis. (R. at 230). Dr. Stillman noted that Plaintiff displayed psychomotor retardation in speech and body movements, and that

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" OR "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

3

he was a "mild mannered man." (R. at 230). She diagnosed Plaintiff with major depressive disorder, recurrent, severe; post-traumatic stress disorder; cocaine dependence in full sustained remission since 2008; and avoidant personality disorder. (R. at 230). She assigned him a GAF score of 50, and started him on a trial of Zoloft. (R. at 230). Plaintiff was to continue with his Targeted Case Manager ("TCM") Jessie Montie, continue with his probation officer until March 2012, and continue individual psychotherapy with Ms. Dingfelder. (R. at 230).

On September 16, 2010, Plaintiff was seen by Charlotte Riddle, CRNP, and reported increased stress because he was behind with his bills and fine payments. (R. at 227). He further reported that being a single parent caused increased stress, causing him to "overreact" with his children at times. (R. at 227). Plaintiff complained of racing thoughts on a daily basis with difficulty sleeping. (R. at 227). He denied any substance abuse and reported that he was compliant with his medication. (R. at 227). On mental status examination, Ms. Riddle reported that Plaintiff was withdrawn, exhibited a depressed mood, was mildly anxious, and tearful. (R. at 227). Plaintiff had normal motor activity, speech, sensorium, thought content, thought flow, and judgment. (R. at 227). His insight was fair, and he had no suicidal/homicidal thoughts. (R. at 227). Ms. Riddle started him on Risperdal to address his mood lability and continued him on Zoloft. (R. at 227).

On November 9, 2010, Plaintiff was seen by Karen Bugaj, CRNP, and complained of mood fluctuations. (R. at 226). He further complained of racing thoughts and difficulty sleeping. (R. at 226). Ms. Bugaj reported that his motor activity, speech, sensorium, and behavior were within normal limits. (R. at 226). She found his mood was depressed and "overwhelmed," and he exhibited a sad affect. (R. at 226). Plaintiff's anxiety state, thought content, thought flow, judgment, and insight were reported as normal. (R. at 226). Plaintiff

denied having any suicidal/homicidal thoughts. (R. at 226). Ms. Bugaj increased his Risperdal and Zoloft dosages. (R. at 226).

Plaintiff was seen by Ms. Dingfelder on November 24, 2010 and reported that he "fe[lt] better" about his depression and that therapy was "working well." (R. at 225). He was compliant with his medication regimen. (R. at 225).

On December 10, 2010, Ms. Riddle completed a form entitled "Medical Assessment of Ability To Do Work-Related Activities (Mental)." (R. at 241-244). With respect to making occupational adjustments, Ms. Riddle opined that Plaintiff would have a "fair" ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention/concentration. (R. at 241). "Fair" was defined on the form as "[a]bility to function in this area is limited but satisfactory." (R. at 241). She further opined that he would have a "poor" ability to deal with work stress. (R. at 241). "Poor" was defined as "[a]bility to function in this area is seriously limited but not precluded." (R. at 241). With respect to making performance adjustments, Ms. Riddle found that Plaintiff had a "fair" ability to understand, remember and carry out complex job instructions, detailed but not complex job instructions, and simple job instructions. (R. at 242). She stated however, that "depending on level of functioning," Plaintiff's ability to function daily in a job setting was limited. (R. at 242). She found Plaintiff had a "fair" ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability, but that his mood and depressive symptoms would impact his ability in these areas. (R. at 242). Finally, Ms. Riddle opined that Plaintiff would not be able to work a normal work day/work week due to his mental impairment. (R. at 243).

On January 20, 2011, Plaintiff was accompanied by his TCM, and complained of feeling anxious with some depression, as well as difficulty sleeping. (R. at 224). Plaintiff acknowledged that his mood and depression were due to his lack of sleep. (R. at 224). On mental status examination, Ms. Bugaj reported Plaintiff's mood was depressed and anxious, and he had a blunted affect. (R. at 224). His remaining mental status examination was within normal limits. (R. at 224). He was started on a low dose of Trazodone to address his mood and sleep complaints. (R. at 224).

Plaintiff was seen by Ms. Bugaj on March 9, 2011 and was accompanied by his TCM. (R. at 223). Plaintiff reported that he was "doing very well" and was sleeping "much better" with the addition of Trazodone. (R. at 223). His mental status examination revealed that he was within normal limits in all areas, including behavior, mood, affect and anxiety state. (R. at 223).

When seen by Ms. Dingfelder on March 24, 2011, Plaintiff reported that he felt his mental health was under control. (R. at 221). He indicated that he spent a lot of time in his room and felt most comfortable there. (R. at 221). Plaintiff also continued to process his feelings and past events in therapy. (R. at 221).

On May 12, 2011, Plaintiff was seen by Ms. Riddle, and relayed his concerns that he was decompensating. (R. at 220). Plaintiff reported that his depressive symptoms had worsened, and he was bothered by racing thoughts. (R. at 220). Plaintiff indicated that he was self-isolating by spending his evenings in his room, or entire weekends when his children were gone. (R. at 220). On mental status examination, Ms. Riddle reported that his motor activity, speech, sensorium, and thought flow were within normal limits. (R. at 220). She found his behavior withdrawn, his mood was depressed, his anxiety state was mildly elevated, he had ideas of worthlessness, and his affect was sad and depressed. (R. at 220). Plaintiff's judgment and insight were fair, and he

had no suicidal/homicidal thoughts. (R. at 220). Ms. Riddle increased his Zoloft and Risperdal dosage amounts to address his symptoms. (R. at 220).

Ms. Riddle opined on May 12, 2011 that, based upon her observation of the Plaintiff, his clinical history, and her review of his "signs/symptoms," he would be incapable of maintaining regular attendance, interacting appropriately with co-workers and supervisors, and responding appropriately to supervisory criticism. (R. at 245).

On May 27, 2011, Ms. Monti, Plaintiff's TCM, wrote a letter stating that Plaintiff had been receiving services from Stairways Behavioral Health Targeted Case Management services since May 14, 2010. (R. at 248). Ms. Monti stated that the criteria for eligibility for TCM services were: having a severe mental illness, a mental health treatment history, and difficulty functioning appropriately in the community. (R. at 248). She indicated that TCM was working on the following mental health goals with Plaintiff: maintaining stability; monitoring participation in treatment; attending appointments; collaborating with providers; monitoring effectiveness of medications; advocating, if needed, for inpatient hospitalizations; supporting/promoting positive means of coping/relaxation; preventing isolation; and increasing positive socialization. (R. at 248).

4. <u>Administrative Hearing</u>

Plaintiff testified at the hearing held by the ALJ that he was single and lived with his mother, brother and his two children, ages three and five. (R. at 38-39). He further testified that he was enrolled in school for an electrical trade, but had been unable to finish due to depression. (R. at 40). Plaintiff testified that, during a 30-day period, every day was a bad day for him prior to treatment, but since treatment, he had only 10 to 12 bad days. (R. at 42). Plaintiff indicated that on bad days, he isolated himself in his room and slept or watched television. (R. at 42-43).

7

He stated that he was home alone during the day with his children, but that his mother took over when she came home from work in the evening. (R. at 42). He indicated that his brother and cousin also helped with the children. (R. at 42). Plaintiff testified that he slept poorly due to racing thoughts. (R. at 44). He stated that although lack of sleep resulted in a lack of energy, he was still able to take care of his children, but "not much more" than that. (R. at 44). Plaintiff testified that even on a bad day, he was able to play with his children or take them to the park. (R. at 44). Plaintiff testified that he "shut down" when under stress, and did not take criticism "very well." (R. at 45).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to simple, routine repetitive tasks, involving routine work processes and settings, not involving high stress, which would be high quota or close attention to quality production standards, who could have no more than incidental interaction with the public, and no engagement in teamwork or team-type activities. (R. at 46). The vocational expert testified that such an individual could perform bench assembly and fabricator positions, hand working occupations, and building cleaner positions. (R. at 46-47).

**B.  ANALYSIS**

1. Standard of Review

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under

Title XVI.  *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a).  In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2012.  (R. at 21).  SSI does not have an insured status requirement.

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability.  20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-5 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

2. <u>Discussion</u>

The ALJ found that Plaintiff's major depressive disorder, post-traumatic stress disorder, avoidant personality disorder, and cocaine dependence in full sustained remission were severe impairments, but determined at step three that he did not meet a listing. (R. at 21-23). The ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, with the following nonexertional limitations: he was limited to simple and repetitive tasks, involving routine work processes and settings, performed in a low-stress work environment, defined as one not involving high quotas or close attention to quality production standards. (R. at 23). The Plaintiff was further limited to occupations involving no more than incidental interaction with the public, and no teamwork or team-type activities. (R. at 23). At the final step, the ALJ concluded that Plaintiff could perform the jobs of a bench assembler/fabricator; a hand-working occupation such as cutting, molding, casting or trimming; and a building cleaner. (R. at 28). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S. C. § 405(g).

Plaintiff's challenges relate to the ALJ's residual functional capacity ("RFC") assessment. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id*. (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). While the Plaintiff advances several arguments in support of his contention that the ALJ's RFC determination is not supported by substantial evidence, we find his argument with respect to the ALJ's evaluation of the opinion evidence to be dispositive in this case.

Plaintiff argues that the ALJ improperly assigned "little weight" to the opinion of Ms. Riddle. *See* (ECF No. 9 at 9-20). Plaintiff acknowledges that Ms. Riddle, as a CRNP, is considered an "other source" under 29 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1) (other sources include nurse practitioners). Social Security Ruling 06-03 clarifies how evidence from these sources should be evaluated by an ALJ. While evidence from other sources cannot establish the existence of a medically determinable impairment, such individuals are "valuable sources of evidence for assessing impairment severity and functioning." *SSR* 06-3p; 2006 WL 2329939 at

*3. In evaluating this evidence, the ALJ should consider the following factors: the nature and extent of the relationship between the source and the individual; the source's qualifications; the source's area of specialty or expertise; the degree to which the source presents relevant evidence to support his or her opinion; whether the opinion is consistent with other evidence; and any other factors that tend to support or refute the opinion. *SSR* 06-03p; 2006 WL 2329939 at *5.

As set forth above, on December 10, 2010, Ms. Riddle opined that Plaintiff would have a "fair" ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention/concentration. (R. at 241). "Fair" was defined on the form as "[a]bility to function in this area is limited but satisfactory." (R. at 241). She further opined that he would have a "poor" ability to deal with work stress. (R. at 241). "Poor" was defined as "[a]bility to function in this area is seriously limited but not precluded." (R. at 241). Ms. Riddle found that Plaintiff had a "fair" ability to understand, remember and carry out complex job instructions, detailed but not complex job instructions, and simple job instructions. (R. at 242). She stated however, that "depending on level of functioning," Plaintiff's ability to function daily in a job setting was limited. (R. at 242). She found Plaintiff had a "fair" ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability, but that his mood and depressive symptoms would impact his ability in these areas. (R. at 242). Ms. Riddle opined that Plaintiff would not be able to work a normal work day/work week due to his mental impairment. (R. at 243).

Five months later, on May 12, 2011, Ms. Riddle opined that, based upon her observation of the Plaintiff, his clinical history, and her review of his "signs/symptoms," he would be

13

incapable of maintaining regular attendance, interacting appropriately with co-workers and supervisors, and responding appropriately to supervisory criticism. (R. at 245).

The ALJ afforded "little weight" to Ms. Riddle's opinions, reasoning:

> …The record as a whole does not support the opinion that the claimant is incapable of working a normal workday/workweek, maintaining regular attendance or interacting appropriately with others. Furthermore, these conclusions are not supported by Ms. Riddle's initial assessment of the claimant's functional abilities rendered in December 2010, as discussed above. At that time, Ms. Riddle found that the claimant's ability to relate to coworkers, interact with supervisors, and demonstrate reliability were satisfactory. There is nothing in the record to support such a marked decline in the claimant's level of functioning from December 2010 to May 2011. The undersigned acknowledges that at his last appointment, the claimant once again reported an increase in his depressive symptoms; however, the claimant himself acknowledged that even during these periods of increased symptoms, he remained capable of caring for his two young sons.

(R. at 25-26).

We find that the ALJ's first reason for assigning "little weight" to Ms. Riddle's assessment is inadequate. When rendering a decision, an ALJ must generally provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Here, while the ALJ discussed the Plaintiff's treatment records from Stairways in his recitation of the medical evidence, the ALJ did not identify or explain what evidence he relied upon in concluding that Ms. Riddle's assessment was not "supported by the record as a whole." (R. at 25). For example, Plaintiff's treatment records reveal mixed findings that do not inform on the Plaintiff's ability to work. In July 2010, Dr. Stillman reported that Plaintiff displayed psychomotor retardation in his speech and body movements. (R. at 230). In September 2010, Ms. Riddle reported that Plaintiff was withdrawn, exhibited a depressed mood, was mildly anxious and was tearful. (R. at 227). His medications were adjusted to address his mood

14

lability. (R. at 227). On November 9, 2010, Plaintiff complained of mood fluctuations, and Ms. Bugaj found that his mood was depressed and "overwhelmed," and he exhibited a sad affect. (R. at 226). His medication dosages were increased. (R. at 226). By November 24, 2010, however, Plaintiff reported that he felt better and his therapy was "working well." (R. at 225). On January 20, 2011, Plaintiff complained of depression and Ms. Bugaj reported that Plaintiff's mood was depressed and anxious, and he had a blunted affect. (R. at 224). On March 9, 2011, Plaintiff reported feeling much better and his mental status examination was within normal limits. (R. at 223). On March 23, 2011, Plaintiff reported that he felt his mental health was under control. (R. at 221). By May 12, 2011, however, Plaintiff felt he was decompensating, and reported that his depressive symptoms had worsened, he was bothered by racing thoughts, and he was self-isolating. (R. at 220). Ms. Riddle reported that Plaintiff was withdrawn, his mood was depressed, his anxiety state was mildly elevated, he had ideas of worthlessness, and his affect was sad and depressed. (R. at 220). To the extent the ALJ was of the view that the above records were inconsistent with Ms. Riddle's assessment, he is directed to explain his rationale for such finding on remand.

The ALJ further found that Ms. Riddle's May 2011 assessment was not supported by her initial assessment in December 2010, wherein she found Plaintiff had a "fair" ability to relate to co-workers, interact with supervisors, and demonstrate reliability. (R. at 256-26). The ALJ found there was nothing to support such a "marked decline" in the Plaintiff's level of functioning from December 2010 to May 2011. (R. at 26). The ALJ's stated reason in this regard, however, does not show a fair consideration of all the evidence. "Where competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano*, 606

15

F.2d 403, 407 (3d Cir. 1979), and "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000).

A review of both reports reveals that they are not necessarily inconsistent with each other, or the medical evidence. First, although Ms. Riddle found in December 2010 that Plaintiff had "fair" abilities in some areas, she was nonetheless of the view that Plaintiff was unable to work a normal work day/work week due to his mental impairment. (R. at 243). In addition, Ms. Riddle specifically stated in her December 2010 opinion that Plaintiff's ability to demonstrate reliability would be impacted by his "mood and depressive symptoms." (R. at 242). Finally, Ms. Riddle's opinion that Plaintiff would be incapable of interacting appropriately with co-workers and supervisors, and responding appropriately to supervisory criticism, is arguably supported by the treatment note entries in May 2011. Plaintiff relayed his concerns that he was decompensating, and Ms. Riddle found him withdrawn, depressed and sad, and increased his medication dosages to address his increased symptoms. (R. at 220). On remand, the ALJ "must review all of the pertinent medical evidence, explaining his conciliations and rejections." *Burnett*, 220 F.3d at 121.

The ALJ further relied on the Plaintiff's alleged ability to care for his two young sons in rejecting Ms. Riddle's assessments. Plaintiff testified that his brother, who lived with him, as well as other family members, who lived next door, helped him care for his children while his mother was at work during the day. (R. at 42-43). Plaintiff further testified that his cousin came over daily and played with his children and took them to the park. (R. at 43). Plaintiff also indicated that his mother "[took] over" the care of his children when she came home from work at 5:00 p.m. (R. at 42). The ALJ acknowledged that Plaintiff received help from his extended family, but noted that he took care of his sons and played with them every day regardless of his

16

mental state. (R. at 22). An ALJ may appropriately consider the number and type of activities in which a claimant engages when assessing his or her residual functional capacity. *Burns v. Barnhart*, 312 F.3d 113, 129-30 (3d Cir. 2002). However, in light of the errors identified above, appropriate consideration could not have been given to the Plaintiff's testimony, and the ALJ is directed to reevaluate his testimony on remand.

### C. CONCLUSION

Based upon the foregoing, it is respectfully recommended that the Commissioner's Motion for Summary Judgment (ECF No. 11) be denied, that Plaintiff's Motion for Summary Judgment (ECF No. 8) be denied to the extent that he requests an award of benefits but granted to the extent he seeks a vacatur of the Commissioner's decision, and a remand for further proceedings. It is further recommended that the Commissioner's decision be vacated, and that the case be remanded for further consideration of Plaintiff's application for benefits. The Commissioner should be directed to "reopen and fully develop the record before rendering a ruling" on Plaintiff's claim. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010). In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

January 6, 2014

*s/ Susan Paradise Baxter*
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.